IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2019

**IN RE KEAGAN P.**

**Appeal from the Circuit Court for Blount County**
**No. E-27956     Tammy M. Harrington, Judge**

_____

**No. E2019-00055-COA-R3-PT**

_____

A trial court terminated a father's parental rights on the basis of abandonment by failure to visit and substantial noncompliance with a permanency plan.  The father appealed, and we affirm the termination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and CARMA DENNIS MCGEE, JJ., joined.

Molly Jo Hardin, Knoxville, Tennessee, for the appellant, John R.P.

Herbert H. Slatery, III, Attorney General and Reporter, and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  FACTUAL AND PROCEDURAL BACKGROUND

Teresa M.H. ("Mother") and John R.P. ("Father") are the parents of Keagan P., who was born in 2015.  Keagan was removed from his parents' care and placed in the temporary custody of the Department of Children's Services ("DCS" or "the Department") in August 2017 when he was found living in a homeless shelter with Mother.[1]   Mother and Father were awarded supervised visitation pursuant to a

_____

[1]Keagan's siblings, who are not at issue in this appeal, were placed into DCS custody a week earlier when a neighbor realized they were living in a house with no adult(s), no electricity, and no running water. During a preliminary dependency and neglect hearing involving Keagan's siblings on August 16, 2017, the juvenile court magistrate issued a bench order that Keagan be removed and placed into DCS's custody when she learned that he was living with Mother in a homeless shelter.

preliminary hearing order dated August 16, 2017. At an adjudicatory/dispositional hearing on November 16, 2017, the trial court ordered DCS and the parents to have a conference call each month to set up the next month's visitation schedule. Mother and Father were required to confirm their visits with the DCS case manager twenty-four hours in advance of each scheduled visit, and DCS was directed to assist the parents with their travel expenses by providing them with gas cards.[2]

The Department initially prepared a Family Permanency Plan on August 28, 2017, with the permanency goal of returning Keagan and his siblings to their parents. This plan was ratified by the trial court on November 16, 2017, and it had a goal target date of February 28, 2018. The parents were not making progress with the requirements set forth in this plan, so a second permanency plan was created on April 2, 2018. In addition to the goal of returning Keagan and his siblings to their parents, the second plan included the permanency goal of adoption. This plan was ratified by the trial court on May 11, 2018. Father's responsibilities under the second plan were identical to those set forth in the first plan, with a few responsibilities added. Father was required to visit Keagan at least twice each month. He was permitted to have visitation in person and via e-mail, phone calls, and letters. His in-person visits were to be supervised initially, with the level of supervision diminishing as he met his responsibilities under the plan. Father was also required to do the following: maintain a substance-free lifestyle without legal infractions; complete an alcohol and drug assessment and follow all recommendations; sign a release of information to allow DCS access to the results of the assessments; submit to random drug screenings upon request by DCS; sign releases for background checks in Tennessee and West Virginia; contact the family service worker ("FSW") weekly to provide an update on his living and job situation and his progress on recommendations resulting from assessments; maintain safe housing free of environmental hazards; and complete parenting assessments, provide the FSW with a certificate of completion, and follow recommendations. Father was required to provide proof to the FSW of reliable transportation, legal income, and stable housing to show he could support himself and Keagan.

The Department placed Keagan and his siblings together in a foster home that was over 100 miles away from Father. The permanency plan directed Father to provide a transportation plan to the FSW one week prior to each scheduled visit to enable the FSW to prepare the necessary paperwork to submit a request for a gas card to assist Father with his travel costs. On April 26, 2018, Father signed a statement on the second permanency plan indicating that the plan had been discussed with him and that he agreed with the plan. He also signed a statement the same day indicating that he had received a copy of

---

[2]The trial court terminated both Mother's and Father's parental rights, but only Father appeals the termination. Thus, we will not address any issues relating to Mother or Mother's responsibilities under the permanency plans.

the Criteria and Procedures for Termination of Parental Rights ("CPT") and that he was given an explanation of its contents.[3]

From August 2017 to April 11, 2018, when DCS filed its termination petition, Father exercised his visitation rights with Keagan just two or three times. He failed to maintain contact with DCS or complete any of the substantive requirements of the second permanency plan. The Department filed its petition to terminate Father's parental rights on April 11, 2018. The grounds for termination DCS asserted against Father include abandonment by failure to visit, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i),[4] and substantial noncompliance with the permanency plan, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2). Father did not file an answer to the petition.

This case was tried on November 21, 2018. Father was in West Virginia during the trial and was permitted to participate in the proceedings by phone. Father's attorney attended and participated in the trial. The court heard live testimony by Mother, Ms. J. (the foster mother), and Frenchie Mitchell (the current FSW). Roben Hartsell was the FSW from August 2017 through July 8, 2018, and she gave a deposition on October 16, 2018, that was admitted into evidence.

Following the presentation of evidence, the trial court issued a ruling from the bench terminating Father's parental rights based on the two grounds DCS asserted against him. The court then issued a written order on December 12, 2018. Father appeals, challenging the trial court's determination that clear and convincing evidence supports both the grounds for termination and the best interest analysis.

## II. STANDARD OF REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless

---

[3]The record reflects that Father did not attend the meeting with DCS when the initial permanency plan was established and discussed in August 2017, but he participated in the meeting by phone. Father signed a statement on January 18, 2018, indicating that he had received a copy of the CPT and that he was given an explanation of its contents.

[4]The Department alleged that Father willfully failed to visit, within the meaning of Tenn. Code Ann. § 36-1-102(1)(E), and that the visits Father had with Keagan constituted "token visitation," within the meaning of Tenn. Code Ann. § 36-1-102(1)(C).

the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV,* Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, and a parent's rights may be terminated only where a statutory basis exists. *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination

is in the child's best interest.  Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). '"Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings."' *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).  As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts."' *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)).  Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a parent's rights.  *Id.* "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis.  *In re Angela E.*, 303 S.W.3d at 251. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

## III. ANALYSIS

### A. Grounds for Termination

#### 1. Abandonment by Failure to Visit

The termination of a parent's rights may be based on the ground of abandonment, as that term is defined in Tenn. Code Ann. § 36-1-102.  Tenn. Code Ann. § 36-1-113(g)(1).  The Department alleged that Father abandoned Keagan by willfully failing to visit him, as set forth in Tenn. Code Ann. § 36-1-102(1)(A)(i).  When DCS filed the termination petition, that statute provided, in relevant part:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the

subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians . . . have willfully failed to visit . . . the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2018).[5]  The applicable statute defines "willfully failed to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation."  *Id.* § 36-1-102(1)(E) (2018).  "Token visitation" is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."  *Id.* § 36-1-102(1)(C).  The statute further provides that "[a]bandonment may not be repented of by resuming visitation . . . subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child."  *Id.* § 36-1-102(1)(F).  The Department filed the termination petition on April 11, 2018.  Thus, the relevant four-month period is December 10, 2017, through April 10, 2018.  *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed).

"Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent."  *In re Audrey S.*, 182 S.W.3d at 863.  To prove the ground of abandonment by failure to visit, DCS must show by clear and convincing evidence that Father "had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so."  *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Audrey S.*, 182 S.W.3d at 864).

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 864 (citations omitted); *see also Tenn. Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004).  Whether Father failed

---

[5]The statute defining "abandonment" was amended effective July 1, 2018.  As amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment."  Instead, 2018 Tenn. Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support.  To establish this defense, the parent (or guardian) must prove by a preponderance of the evidence that the failure to visit or support was not willful.  Because this change is substantive rather than procedural or remedial, however, the amended statute does not apply retroactively to this case.  *See In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).  Instead, this case is governed by the law in effect when the termination petition was filed in April 2018.

to visit Keagan is a question of fact. *See In re Adoption of Angela E.*, 402 S.W.3d at 640. Whether his failure to visit constitutes willful abandonment under the statute, however, is a question of law that we review de novo, according the trial court's determination no presumption of correctness. *See id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

Father did not testify at the trial. Ms. Hartsell, who was Keagan's FSW from August 2017 through July 8, 2018, testified by deposition that Father visited Keagan just one time during the relevant four-month period, on March 8, 2018. Ms. Hartsell explained that in November 2017 the trial court ordered DCS to schedule a Child and Family Team Meeting ("CFTM") each month to accommodate the parents, who had different schedules, to allow them to select visitation dates that worked for them. Ms. Hartsell submitted an affidavit that was included as an exhibit at trial in which she stated that CFTMs were scheduled in advance and took place on November 30, 2017, January 5, 2018, February 2, 2018, March 2, 2018, April 2, 2018, and May 7, 2018. Father was notified by e-mail and text, and by phone when possible. Ms. Hartsell testified that Father attended fewer than three CFTMs. There is no evidence of the number of visits Father scheduled, but he does not dispute that he visited Keagan only once during the relevant four-month period.

Father cites *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007), to support his contention that he was thwarted in his attempts to visit Keagan more because Keagan was living in a foster home that was over 100 miles away. In that case, the Tennessee Supreme Court stated that "a parent who attempt[s] to visit and maintain relations with his child, but [is] thwarted by the acts of others and circumstances beyond his control, [does] not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. Unlike this case, A.M.H.'s custodians did not allow the child's parents to see A.M.H. as often as her parents wanted. *Id.* at 800. On the day of A.M.H.'s second birthday, her parents wanted to take her with them to have a family photograph made, but A.M.H.'s custodians refused to let her go. *Id.* at 801. The police were called and told A.M.H.'s parents they would be arrested if they returned to the custodians' house. *Id.* As a result, A.M.H.'s parents did not visit A.M.H. in the four months preceding the filing of the termination petition. *Id.* The parents took steps to regain custody of their child during that time, however, by filing a petition to regain custody, initiating two juvenile court hearings, and contacting the local media. *Id.* at 810. Under these circumstances, the Tennessee Supreme Court concluded that the parents' failure to visit their child during the relevant four-month period was not willful. *Id.*

In this case, by comparison, no evidence was introduced that Keagan's foster parents were unwilling to allow Father to visit Keagan or that Father was thwarted by anyone else in his attempts to visit with Keagan. Ms. Hartsell was asked if she helped the parents obtain gas cards to defray some of their travel costs.

Q: Were you able to assist them with gas cards?

A: I was not able to complete CSRs for gas cards.

Q: Why not?

A: I couldn't get the parents to meet with me to complete the paperwork needed by Fiscal to be able to submit for the gas cards.

Q: Okay. Now, can you please explain what a CSR is.

A: A CSR is a Case Service Request. We need a specific document, a TennCare eligibility document, in order -- signed by the parents in order to pay for certain services through the Department.

Q: What, if anything, were you able to provide for the parents on this matter?

A: I wasn't able to assist them with gas cards or anything for transportation mainly because I wasn't able to have enough communication or contact with them to complete the proper paperwork to do so.

Q: Did you experience times that you were frequently unable to make contact with the parents?

A: Yes.

Q: Can you elaborate on that.

A: That was -- I mean, that happened through most of the duration of the case. I was provided phone numbers that were disconnected. I recall by the first hearing in November being provided at least nine phone numbers by parents that were disconnected or not working. Just being able to make contact -- there were times that, you know, I needed to get in touch with the parents. There were times I had no contact information or no reliable contact information except for e-mail addresses. However, there were many periods of time where I just couldn't make any contact with all three of the parents actually.[6]

Ms. Hartsell then explained that even when the parents scheduled a visit, a majority of the visits did not take place.

---

[6]In addition to Mother, the Department sought the termination of two different fathers in this case.

Q: And then the meetings that they did participate in and we actually scheduled a visit, would they show up for those visitations?

A: They didn't show up for a majority of the visits that were scheduled.

Q: And do you remember why they said that they couldn't show up for these visits or why they missed the visits after they scheduled them on their own schedule?

A: Some of the reasons were they did not confirm the visits timely, which is a part of the Permanency Plan. They have to confirm the visits timely in order to move forward with the visits, because these are long-distance visits. Also due to just either forgetting or no communication in general.

Q: And all three parents usually would drive together for a visit, correct, most of the time?

A: To my knowledge, yes.

Q: Okay. And they would state that they didn't have any transportation problems getting to these visits, correct, usually?

A: Normally they would let me know that there weren't any problems getting to visits if they had planned to go.

Q: But then after the fact if they missed the visits, some of the reasons they would say was because of transportation issues?

A: Correct.

Q: And you also offered to provide a transportation plan or gas cards to them?

A: The offer has always been on the table to assist the parents with transportation. However, there are certain responsibilities that the parents have to also -- that the parents also have in order to be able to provide transportation for them.

Q: And have the parents ever asked you for any of those services?

A: The parents have not asked me to complete the paperwork to submit for a gas card, no.

In its written order, the trial court found that Father's single visit to Keagan during the relevant four-month period "amounted to mere token visitation." The court found there could have been more visits, "especially with the Department convening monthly child and family team meetings." Because Keagan was living in a foster home that was over 100 miles away, the court addressed the issue of gas cards that were available to help defray Father's travel costs:

> Counsel for [Father] raised an issue regarding gas cards; *i.e.* whether DCS should have provided those and whether that is a defense. This Court has considered that but does not find it to be a significant barrier to visitation for [Father]. The Department is not in the business of handing out gas cards just to hand them out. They have to be responsible and report where those gas cards go and what happens to them. The parent has to do something to get those gas cards; to have a (transportation) plan; to fill out the necessary paperwork. One can see how a contrary scheme could be abused. There is nowhere in the proof that [Father] tried to obtain the gas cards and [was] denied.

The court found the evidence was clear and convincing that DCS explained to Father his obligation to visit Keagan and the consequences associated with his failure to visit, and it held that DCS met its burden of proving abandonment by failure to visit by clear and convincing evidence.

We agree with the trial court's analysis. Father presented no evidence that he attempted, without success, to contact any DCS employee to schedule a visit, that he sent letters or cards to Keagan, or that he called the foster parents in an effort to speak with Keagan during the relevant four-month period. Because the issue of willfulness is based on one's intent to do or not do something, we infer Father's intent from his failure to attend more CFTMs to schedule visits and his failure to exercise his rights to visit Keagan more than one time in the four months at issue for no apparent reason. *See In re Audrey S.*, 182 S.W.3d at 864 (stating intent must be inferred from circumstances, including parent's actions or conduct). We conclude, based on the circumstances, that Father's single visit in March 2018 constituted merely "token visitation," as defined by Tenn. Code Ann. § 36-1-102(1)(C), and we affirm the trial court's determination that DCS proved by clear and convincing evidence that Father abandoned Keagan by willfully failing to visit him during the relevant four-month period, in accordance with Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i) (2018).

2. Substantial Noncompliance with Permanency Plan

Terminating a parent's rights for substantial noncompliance with a permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) requires the petitioner to show, initially, "that the requirements of the permanency plan are reasonable and related to

remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 547-49, and *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *see* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("[s]ubstantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . ."). If the trial court fails to make a finding regarding the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *In re Valentine*, 79 S.W.3d at 547. The petitioner must then demonstrate "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548-49, and *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)). "Substantial" has been defined as "[i]mportant, essential, and material; of real worth and importance." BLACK'S LAW DICTIONARY (10th ed. 2014). When considering whether a parent's noncompliance is substantial for purposes of terminating his or her parental rights, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

Ms. Hartsell testified that Keagan and his siblings entered DCS custody due to environmental neglect and homelessness. Keagan's siblings were living on their own in a house that had no electricity or running water when they were removed, and Keagan was located in a homeless shelter with Mother a short time later. Ms. Hartsell did not initially know that there were any alcohol or drug concerns, but she learned that the parents suffered from substance abuse after Keagan and his siblings were placed into the State's custody. The trial court found that the requirements of the permanency plans were reasonably related to remedying the conditions which necessitated the children's removal into foster care and that they were in the best interests of the children and the parents. The court also found that the requirements were "doable." Father does not contest these findings.

Ms. Hartsell testified in her deposition that the only plan requirement Father completed was the execution of releases for background checks. In an affidavit submitted as an exhibit during the trial, Ms. Hartsell stated that DCS attempted to provide the parents assistance with "in-home A&D, mental health, and parenting assessments. . . . [Father] reported that he had contacted Helen Ross McNabb for an A&D assessment and a mental health assessment was scheduled for June." However, the record reflects that Father did not follow through with the scheduled assessments and that he failed to complete any other steps required of him under the permanency plan. The record shows that on November 30, 2017, Father informed a FSW that he had just quit a job at Packard Sanitation but would be starting a job at Beverage Control later that day. A short time later the FSW asked Father about his job at Beverage Control, and Father responded that he was not yet working there. Father never provided DCS with any proof of

- 11 -

employment.  Father was arrested on November 30, 2017, and charged with theft of merchandise, which was a Class A misdemeanor.  At the time of trial nearly a year later, there was an outstanding warrant for Father's arrest.

In arguing he was not in substantial noncompliance with the permanency plan, Father relies on a Foster Care Review Board Summary dated April 26, 2018, that was included as an exhibit in the record.  Father and his attorney appeared at the Foster Care Review Board ("the Board") meeting on April 26, 2018; no one from DCS was at this meeting.  The Board reviewed the second permanency plan and identified the parents' responsibilities, indicating whether the parents had "completed," were "actively participating," or were "not compliant" with each task on the plan.  For Father, the Board included the following responsibilities:  (1) maintain housing, income, and transportation; (2) A&D assessment; (3) mental health assessment; and (4) parenting assessment.  The Board indicated that Father was "actively participating" in each task; it did not indicate that any task had been completed.[7]  Under the "Recommendations" section, the Board found that Father had complied with "his most significant responsibilities in the permanency plan," and it instructed Father to "continue to work the perm plan and follow treatment recommendations."  The Board stated that the need for foster care still existed and that the Board did not recommend a change in the plan's permanency goals of "return to parent" and "adoption."

Ms. Hartsell was the only one to testify about the Board's summary, and she explained her understanding of it.  According to her, the Board checked the boxes indicating that Father was "actively participating" in the tasks listed in the summary because "he was at the time doing something or discussed that he had been doing something" in furtherance of the requirements.  The Board's statement that Father had complied with his most significant responsibilities is inconsistent with the testimony elicited from Ms. Hartsell and Frenchie Mitchell, the two DCS employees who worked with Keagan, his siblings, and the parents.   Ms. Hartsell worked with the children and parents from the time the children entered DCS custody in August 2017 until July 9, 2018, when she transferred the case to Ms. Mitchell, who worked with the children and parents until the time of trial on November 21, 2018.  Ms. Hartsell testified that the only plan requirement that Father satisfied was signing the releases allowing DCS to conduct background checks.  When Ms. Mitchell was asked whether Father "completed anything on the permanency plan," she responded, "No, he has not."   Thus, although it may not have been inaccurate to record that Father was actively working on some of the plan's requirements as of the date of the Board's meeting on April 26, 2018, no evidence was presented that he had completed any of the substantive requirements addressing the reasons that Keagan and the other children were removed from their parents' custody by the plan's target date of October 2, 2018.  Father's reliance on *In re Valentine* does not

---

[7]The Board also identified "parenting classes" as one of Father's responsibilities, but no level of completion or participation was noted for this task.

further his cause because, unlike Father, the mother in that case either fully or primarily satisfied the most substantive and important responsibilities of her permanency plan: she obtained stable housing, attended parenting classes, and attended all but one scheduled visitation with her child in the year prior to the termination hearing. *In re Valentine*, 79 S.W.3d at 548-49.

The trial court found that if Father had been willing, DCS would have assisted him in the following ways:

> to complete the alcohol and drug assessment and follow the recommendations; to complete parenting classes; to find a suitable home without any illegal activity; to complete a parenting assessment and follow recommendations; to obtain reliable transportation and suitable income; and to submit to and pass drug screens.

The court found that Ms. Hartsell went over the second permanency plan with Father, that Father was aware of the plan's requirements, and that Father was aware of the consequences from his failure to complete the steps on the plan. The court concluded that the requirements of Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2) were satisfied by clear and convincing evidence. We agree that DCS proved Father's substantial noncompliance with the second permanency plan by clear and convincing evidence and affirm the trial court's decision with regard to this ground.

B.  Best Interest Analysis

After concluding that clear and convincing evidence existed to terminate Father's parental rights on the grounds DCS asserted against him, the trial court conducted a best interest analysis and determined that it was in Keagan's best interest for Father's rights to be terminated. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. The factors a trial court is to consider in determining whether terminating a parent's rights to a child is in a child's best interests are set forth in Tenn. Code Ann. § 36-1-113(i).

Courts are not to conduct a "rote examination" of the factors set forth in the statute to determine whether the factors add up to favor a parent or not. *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case," and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*,

455 S.W.3d at 555). The best interests of a child "must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. When the best interests of a child conflict with those of the parent, "such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

At the time of trial, Keagan and his siblings had been in the same foster home for nine months. The foster mother, Ms. J., described Keagan as follows:

> He wakes up happy and goes to bed happy. He is a very bright little boy. Very smart. All of the children are very intelligent children, very smart children.

She described her bond with Keagan:

> Keagan, he loves me. I love that boy. He's a momma's boy. I'll be in the choir and he's hollering out for me when my husband is holding him for me and hurry to get back to my seat.

Ms. J. testified that the children all call her "Mom, Momma, Mommy," and they refer to her husband as "Dad or Daddy." The children refer to their foster home as their home and are very proud of their bedrooms. Ms. J. testified that she and her husband love Keagan and his siblings and that they are interested in adopting all four children. When asked what her long-term vision was for the health and well-being of the children, Ms. J. responded:

> My long-term vision for each of these children is that they will be productive members in society as I continue to provide for them a healthy, happy, loving, secure, safe home.

The record reflects that Father visited Keagan three or four times during the pendency of this case: in November 2017, March 2018, and April 2018, and possibly in September 2017.[8] Father was living in West Virginia at the time of trial. Ms. Mitchell testified that Father had not visited Keagan in the six months prior to trial. Ms. Mitchell stated that she tried to contact Father numerous times by way of phone and email but was never able to reach him. She left him voice messages, but he never returned her calls. Father attended one CFTM in July 2018, when he scheduled a visit with Keagan, but the visit never took place because Father failed to confirm the visit the day before, as required. Father did not contact Ms. Mitchell after the scheduled visit to apologize for not making it or to reschedule the visit.

---

[8]Ms. Hartsell was unable to remember whether Father visited Keagan in September 2017, and Father provided no evidence of the dates of his visits.

The trial court considered the factors set forth in Tenn. Code Ann. § 36-1-113(i) that apply to the facts of this case and determined that the evidence clearly and convincingly established that it was in Keagan's best interest for Father's parental rights to be terminated. The court wrote:

The Court finds that the facts and circumstances in this case warrant a finding of best interest by clear and convincing evidence. . . . There is no allegation that [Father] has been prevented from visiting either by being in custody or unable to visit. Exhibit 8 reflects that there is an outstanding warrant for his arrest. While this Court does not know how exactly to view that warrant, it is clear that it does not bode well for [Father]. He would not be able to parent a child with an outstanding warrant for his arrest and [Father] does not personally appear for this termination of parental rights trial. While he may have a bond, there must be more than that; there must be an ability to provide care for his child. This Court carefully considered the factors as enumerated in Tenn. Code 36-4-113(i). The Court has carefully considered the following factors in particular as weighing strongly in favor of finding that the State has met its burden of proof, namely:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the parent or Guardian;

As has been stated, . . . [Father] is out of State with a warrant for his arrest. This Court has no knowledge where [Father] resides, where he works, what he does, nothing.

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts have been made.

As has been stated, this Court has addressed the extent to which DCS made efforts and the extent to which it could and does not find factor (2) to be determinative in this case.

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child(ren);

This Court has already addressed visitation with respect to [Father]. . . .

(4) Whether a meaningful relationship has otherwise been established between the parent or Guardian and the child(ren).

There is no doubt in the opinion of this Court that the children love their parents and that the parents love their children. The issue though is not love but whether there is a meaningful relationship. Considering the ages of the children and the time that they have spent in foster care, it would be difficult to say that a meaningful relationship has otherwise been established. This Court finds that there is not a meaningful relationship between [Father] and . . . Keagan.

(5) The effect a change of caretakers and physical environment is likely to have on the child(ren)'s emotional, psychological and medical condition;

The proof is clear and convincing that "all the boxes are checked." [Keagan is] taken care of. [He is] more than taken care of. [He is] thriving. [He is] involved in activities. [He] travel[s]; [he is] involved in church activities. There has been a therapy program that has been completed. Those all good things weigh in favor of establishing permanency outside of the biological parents' care.

(7) Whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home. . . .

There is no proof before this Court that weighs in favor of the parents whatsoever. There are no homes to consider.

This Court had no assessments to consider with respect to factor 8 (parent's mental health) and finds that there is no relevant proof with respect to factor 9 (child support).

Long-term foster care is "disfavored" by the legislature, and the best interest factors set out in Tenn. Code Ann. § 36-1-113(g) "relate to the likelihood that the child will be able to leave foster care and return to the parent's home in the near future." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *8 (Tenn. Ct. App. June 26, 2006). "If that likelihood is remote, the best interest of the child often lies in termination of parental rights so that the child can attain the security and stability of a permanent home through adoption." *Id.*

Father relies on testimony by Ms. Hartsell and by Mother for his argument that the trial court erred in ruling that it was in Keagan's best interest for his rights to be terminated. Ms. Hartsell testified that Father was loving and nurturing towards Keagan and that Keagan was "familiar with" Father when the two were together. Mother testified that Father and Keagan had a stronger bond than Mother had with Keagan and that "Dad" was the only word Keagan said when he was removed from her custody. As the trial court wrote, "While [Father] may have a bond [with Keagan], there must be more than

that; there must be an ability to provide care for his child." Keagan was about twenty months old when he was placed into DCS custody, and he was less than three years old at the time of trial. Considering Keagan's age and the limited times he saw Father in the year prior to trial, it would be a stretch for this Court to find, from Keagan's point of view, that a meaningful relationship existed between Father and Keagan.

Father presented no evidence of any steps he has taken to improve his situation since the time Keagan was removed from Mother's and his custody. We conclude that the evidence in the record supports the trial court's best interest analysis by clear and convincing evidence. Accordingly, we affirm the trial court's determination that terminating Father's parental rights is in Keagan's best interest.

## IV. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, John R.P., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE